*In re* ESTATE OF TELLER.

MADDEN *v.* TELLER.

WILLS—UNDUE INFLUENCE—QUESTION OF FACT.

Evidence, in proceedings for the probate of a will, tending to show undue influence exercised upon the mind of the testator, *held*, to present a question of fact for the jury, and judgment for contestant affirmed.

Error to Livingston; Miner, J., presiding. Submitted January 10, 1916. (Docket No. 78.) Decided March 30, 1916.

The will of Eliza Teller, deceased, was presented for probate by Bert Skinner, executor. From an order admitting the same to probate John Teller, who contested the probate of the instrument, appealed to the circuit court. Judgment for contestant. Proponents, Ella Madden and others, bring error. Affirmed.

*Chapman, McNamara & Matthews,* for proponents.

*W. P. Van Winkle & Son* and *Louis E. Howlett,* for contestant.

MOORE, J. This is a will contest. The will of Eliza Teller, deceased, was offered for probate in the probate court of Livingston county, and the case was duly certified to the circuit court upon the application of John Teller, contestant, according to the provisions of Act No. 238, Pub. Acts 1911 (3 Comp. Laws 1915, § 14145, note).

Mrs. Teller died April 12, 1914, at the age of 63, leaving five children, John Teller, Ella Madden, Mary Skinner, Mabel Teller Osborn, and Edward Teller. Her husband died some years previous. The deceased

owned some personal property at the time of her death, and a farm of 100 acres in Livingston county. She left two wills, one dated November 19, 1908, and the will involved here, dated December 24, 1913. The contest was based upon the claims of mental incompetency and undue influence. A perusal of the two wills will show that in the second will John Teller, the contestant, was left out as one of the residuary legatees.

The circuit judge took the claim of mental incompetency away from the jury, but submitted the question of undue influence. The jury found against the will. The case is brought here by writ of error, and the single question is whether under the testimony the case should have been submitted to the jury upon the question of undue influence.

The question involved is one of fact. John Teller was the oldest son. His father was not a successful business man. After his death John managed the farm successfully for a number of years, and the record indicates that his mother and he were very friendly until the fall of 1913. There is nothing to indicate ill will between him and the other children until the summer or fall of 1913. It is the claim of John that the work he did upon the farm was upon the understanding that his mother was to pay him for it when she was able, and that, if she did not pay him, he was to have his pay out of her estate. He further claims that in the fall of 1913 he called to see his mother; that his brother, Ed, and his sister Mrs. Madden were there, and the buggy of his sister Mrs. Skinner was near the barn, though he did not see her; that his mother had been crying, and that the rest of the family did not speak to him, though he spoke to them; that soon after he learned his mother had made a bill of sale of all her personal property to her son-in-law Mr. Skinner, and was offering the farm for sale for cash, and was

cautioning those to whom she offered it to say nothing about it, as she did not want John to know about it. After learning this, and on December 4, 1913, he commenced a suit in chancery making his mother, his brother and three sisters parties, averring that they were conspiring to induce his mother to dispose of her property and thus defeat his claim to which reference has already been made. On the 18th of December, 1913, all of the defendants joined in an answer to this bill of complaint admitting the services of John, but claiming they were rendered under a contract and had been fully compensated for, and a receipt had been given in full by John. Attached to the answer was a copy of the will of November, 1908, and a reference to it in the answer as follows:

"She farther shows that said will is on this date in force, and has not been changed or revoked by any codicil or subsequent will, and that she has no intention of revoking or changing the same unless it should become necessary in fairness to her other children to deduct something from the share of which complainant will be entitled in her property at her death on account of the unnecessary and unreasonable cost and expense that he has caused her to pay and bear on account of this unfair and wholly unnecessary litigation brought by him in a manner which seems to this defendant to be extremely cruel and not becoming a son whom his mother has always treated in the most kindly manner and with the highest regard and respect."

Six days after this answer was signed by her she appeared before the solicitor who drew it, with her daughter, Mrs. Skinner, and made the will of December 24, 1913. In the first will she named John Teller her executor; in the second will she named her son-in-law Bert Skinner as executor. In the second will occurs the following:

"I am at this time fully mindful and aware of the existence of my son, John Teller, and of his financial condition and of the various properties I have given

him before this date. I am fully aware of all claims and obligations that he as my son has shown upon me his parent, and I have made the above will of my own accord and without being influenced to do so by any other person. Neither has any clause of this will been suggested to me, but I have thought the matter all over and come to the above conclusion because in my judgment it is right and fair according to the deserts of all parties concerned. And I farther state that I am not moved or influenced in making this will by any other motive except to be fair to all my children."

It is the claim of appellants that the mother hoped that after John read the answer he would discontinue his case, and that, if he did not, she would disinherit him and that it was because he did not she made the second will. It is the claim of John that the changed attitude of his mother toward him as indicated by the bill of sale, the effort to sell the farm secretly, and the making of the second will was brought about by lies about him told to his mother by his brother Ed and the pressure of the other children brought to bear upon her.

Mrs. Skinner went to Owosso with her mother when the will was drawn. Her mother had been stopping at her house a few days before that. The sister Mabel was also there. She disclaimed having attempted to influence her mother. Her attitude toward John at this time is disclosed by some of her testimony:

"I never have had a word with my brother John, and have never had any trouble with him, but I don't feel just now under the circumstances like owning him as a brother; don't feel very friendly. I concluded that I didn't own John as a brother after he served the papers on my mother in the chancery suit, and since that time I have not been willing to own him as a brother."

The record discloses a like feeling on the part of the other brother and sisters. It shows that Mrs. Skinner

was present when the will was read to her mother, signed, and executed. We quote:

"In your office on the 24th when you read the will over, and it came to where my husband was executor, I said, 'Why, mother, what do you want to do that for?' and I said, 'I think you might better have somebody else for executor.' And she said, 'Well, I don't; I want him and I am going to have him.' You asked me what my reason was, and I said because there was trouble in the family, and I thought it would be better to have a stranger as executor. And she said, 'No; I want Bert and I am going to have him.' That is all that was said about it."

Edward Teller was a witness. We quote some of his testimony:

"I am the Edward Teller spoken of in this suit. In the month of October, 1913, I had a conversation with John Teller of his having claims or going to make claims against his mother's property. He said he had $3,600 against my mother for eight years' work; that he was going to have it, and the one that kept the quietest would get the most. I know who he meant by the one who kept the quietest—the heirs. That is the substance of what he told. When I went home I stopped there and told my mother what he said. She didn't say much of anything. I don't think she said anything. She could hardly believe it. I saw her from time to time after that, and I noticed a change in her in respect to the way she acted and talked. The change that I noticed was that it was a worry to her. I can't recall now. It seems as though she talked with me more about it. * * * John told me that he had $3,600 against mother, and he was going to have it right off quick. He said it was for eight years' work; for the years he was to home, I suppose."

In the answer the following occurs:

"These defendants, further answering said paragraph, say that after the death of Samuel Teller, at a date which they are unable to give, that the trunk of defendant Eliza Teller was by some one broken into, ransacked, and stripped, and many important papers

were taken therefrom, including the above-mentioned contract between Samuel Teller, Eliza Teller and complainant, John Teller. And defendant Eliza Teller says that she has never seen said contract since that time, and each of these defendants for themselves say that they have never seen said contract since that occasion. But Eliza Teller says that she first missed said contract some time after she had executed the deed to John Teller above mentioned, on the 15th day of May A. D. 1900, and that shortly after that time she called the attention of her daughter Ella Madden to the fact, and showed her the trunk and what had been done to it. But none of these defendants have any positive knowledge as to who did the act, but have in their own minds a suspicion as to who did it; as the taking of such papers, viewed in the light of the bill of complaint filed in this case, could have been of interest to only one party."

The scrivener testified in relation to this paragraph:

"In regard to the statements in the answer concerning the breaking into a trunk, only Mrs. Teller and Mrs. Madden made statements about it. Mrs. Madden said that, when she and her mother looked it over, they thought that John Teller had ransacked the trunk, because papers were taken that were of interest to nobody else except John Teller. Mrs. Madden told me this in the presence of her mother, Eliza Teller."

There is a great deal of testimony showing the mother frequently referred to what Edward told her about John, and felt badly about it, often crying about it. John denies that he ever broke into the trunk, or had any knowledge of its being broken into. He admits a talk with Edward in which he told him the true status of his claim, but denies that he ever told him that he was going to press his mother for his claim, and his version of the conversation is corroborated by a neighbor who was present and heard it.

The record shows that the mother talked with different neighbors shortly before her death in relation to John, and read to them or had them read the will

of 1908, and stated that she still thought a great deal of him and wanted him to share with the rest of her children her property, and she stated the will she read to them or had them read, giving him the same share as the rest was her last will and gave the property as she wanted it to go.

The record is very long. No one can read it without reaching the conclusion that the jury would have been warranted if they believed certain of the testimony in finding that Mrs. Teller disinherited John because of his bringing the chancery case. On the other hand, there is abundance of testimony to justify the conclusion that she was unduly influenced in making the second will.

The judgment is affirmed.

STONE, C. J., and KUHN, BIRD, STEERE, BROOKE, and PERSON, JJ., concurred. OSTRANDER, J., did not sit.